**SUN LIFE ASSURANCE COMPANY OF CANADA, a corporation, Plaintiff,**

v.

**Clarence Abraham HOY and Paul R. Stockdale, Defendants.**

Civ. No. 1629–D.

United States District Court
E. D. Illinois.

May 14, 1959.

**860**

Robert Acton, Jr., Danville, Ill., for plaintiff.

John Finfrock, Urbana, Ill., for Clarence Abraham Hoy.

James B. Wallace, Covington, Ind., and Thomas C. Stifler, Danville, Ill., for Paul R. Stockdale.

PLATT, Chief Judge.

This suit originated as an interpleader under 28 U.S.C. § 1335. On October 3, 1938, plaintiff, Sun Life Assurance Company of Canada, a Canadian corporation, issued a policy No. 1,573,403 upon the life of Mrs. Fanny Drennan in the amount of $8,000. She died at Urbana, Illinois on February 20, 1958. Her surviving husband, Clarence Abraham Hoy, a citizen of Illinois, and her brother, Paul R. Stockdale, a citizen of Indiana, each claimed the proceeds of the policy. The determination of their respective claims hinges upon the validity of the document dated February 19, 1958 which purports to change the beneficiary of the policy from Hoy to Stockdale, and upon an oral antenuptial agreement which, is alleged by Hoy to have existed, and to have created a disability on the part of the decedent to change her beneficiary. Plaintiff has paid into the registry of this court, the

amount of $8,000, and on July 23, 1958, an order was entered discharging it from further liability.

When the policy was first issued Paul R. Stockdale was the beneficiary. The right to change beneficiary was reserved. On July 23, 1943, the beneficiary on the policy was changed to "Thomas Jefferson Smith, My Husband." Upon the death of Mr. Smith, Fanny D. Smith, under date of July 24, 1949, sent plaintiff a change of beneficiary to Paul R. Stockdale, which was endorsed upon the policy.

On June 18, 1950, assured being about the age of 55 years, and having no children, was married at Loda, Illinois to claimant, Clarence Abraham Hoy, who being about 65 years of age, had children by a former marriage. At the time of her marriage, Mrs. Hoy owned about $10,000 worth of government savings bonds, and the policy here involved. The defendant, Mr. Hoy, owned a 1947 Packard automobile, with one or two payments yet due, a small savings account, a small checking account, and some insurance policies on his own life.

Hoy testified that early in 1950 he had several conversations with his intended wife; that they spoke about "having life incomes of so much and neither one had a home; that it would take both of us to make a home; that she felt as though to have a home she would have to have someone with her, and I felt the same way; and we agreed that a marriage would be all right, with the exceptions to buying a home I didn't have the ready cash to make a down payment on a home. She says, 'I've got money enough to make the down payment and that would buy us a home' * * *. Then when we begun to get things together was when we agreed that we would take everything in joint. It didn't make any difference which one it was. We had one permit book, one bank account, and we agreed at that conversation that we would change our policies. * * *

"The insurance policies of mine would be made payable to her and that hers would be made payable to me."

August 1, 1950, Hoy effected a change in beneficiary upon his policies to "Fanny Hoy, wife." August 5, 1950, the Hoys opened a joint bank account in the Busey First National Bank of Urbana, Illinois. Mrs. Hoy cashed some of her government bonds and deposited a large portion of the proceeds into the joint account. Mr. Hoy transferred his small savings and checking accounts to the same joint account. He also caused the title to his automobile to be similarly changed and when they traded automobiles title was taken jointly each time. On the same day, Mr. and Mrs. Hoy purchased residence property in Urbana, Illinois, on a contract. A warranty deed made to the Hoys in joint tenancy was held in escrow. The down payment was provided from funds deposited in the joint checking account. The monthly payments on the contract were also made from the joint account into which the Hoys deposited their respective incomes during the period of their marriage. Their incomes were derived principally from rentals on apartments maintained in the residence property, from Mrs. Hoy's services as a Christian Science Practitioner in which her husband gave assistance, from Mr. Hoy's wages as a baker, and later from his social security payments.

October 6, 1950, Mrs. Hoy effected a change of beneficiary on her policy to "my husband, Clarence Abraham Hoy." She also cashed some of the $100 government bonds to cover the expenses of vacation trips upon which she and her husband traveled together. The remainder of the bonds which were payable to "Fanny Smith," she kept uncashed. Premiums to maintain all the insurance policies were paid from the joint account.

In January, 1956, after paying the balance of the purchase price, the Hoys received the warranty deed to the Urbana residence as joint tenants. They acquired the money to pay the balance due by giving a note for the proper amount to the Busey Bank. The note was signed by each in his and her own right and as husband and wife, and a mortgage was executed upon the premises to secure the note.

Toward the end of 1957, Mrs. Hoy became aware of the fact that her health was impaired. Paul Stockdale testified that in October, 1957, he had a conversation with his sister and she told him the details of her funeral arrangements which she wanted carried out; and that she wanted to change the beneficiary on her insurance policy to him.

Sometime in January of 1958, Mrs. Hoy's condition became worse and she was unable to do her work. Irma E. Pierson, a practical nurse, was hired by Hoy to care for her in the home. Mrs. Pierson testified that shortly after her arrival, Mrs. Hoy told her on different occasions that she wanted to make Paul beneficiary of her insurance policy but that Mr. Hoy did not want her to, and that he became angry when it was mentioned.

February 17, Mr. Hoy called Paul Stockdale's home to inform him that Fanny's condition was bad, and he and his wife went to Urbana the following day. Early in the morning of February 19, Mrs. Lorena Reed came to spend the day with Mrs. Hoy. She had met Mrs. Hoy through the latter's work as a practitioner, and through Mr. Hoy whom she had known all her life. Mrs. Reed testified that Mrs. Hoy was uncomfortable, uneasy, and answered questions but did not converse. She further testified that when certain government savings bonds were brought in by Mr. Hoy for Fanny to sign, that she asked Fanny, in the presence of Mr. Hoy and Paul Stockdale if she wanted to sign those bonds, and Fanny made it clear that she did, and that she wanted the $1,000 bond to go to her niece, Paul Stockdale's daughter, to further her musical education. She supported Mrs. Hoy while the latter signed "Fanny Smith" and then "Fanny Hoy." Hoy and Stockdale then took the endorsed bonds to the bank and had them cashed. On the $1,000 bond a draft for $920 was made payable to Paul Stockdale, for his minor daughter. Mr. Hoy received the proceeds from the two $100

bonds, which he deposited in the joint account.

During the afternoon of February 19, Mrs. Rosalie Jordan and her daughter, Pat Jordan, came to the Hoy home, and about 4 p. m. Mrs. Pauline Weber arrived. All were friends of Mrs. Hoy. Shortly after Mrs. Weber's arrival, Mrs. Reed departed for about one and one-half hours. During her absence one of Mrs. Hoy's friends suggested to Mr. Hoy that he get some rest. He retired to the basement bedroom. Mrs. Jordan testified that she visited on and off with Mrs. Fanny Hoy since 1953, and that sometime during the fall of 1957 Fanny had told her "she would like to undo something she had done," and that she would like to sign over her policy to Paul, but that Mr. Hoy would not permit it.

Mrs. Weber testified that Fanny had spoken to her in the fall of '57 about changing the insurance policy and had mentioned it again on the Sunday before her death; that on the evening of February 19, after Mr. Hoy had retired and Mrs. Reed had departed, Mrs. Jordan and Mrs. Pierson began talking about the beneficiary change. Mrs. Weber procured the address and drove Paul Stockdale to the local insurance agency, where he obtained the proper forms, and they drove back to the Hoy home.

Pat Jordan testified that, in the meantime, she called her sister, Mrs. Marilyn Catalano, who was a notary public. Mrs. Catalano testified that she knew Mrs. Hoy from Sunday School but did not know Mr. Hoy; that Fanny Hoy had never talked to her about changing the beneficiary on the policy but had on previous occasions mentioned notarizing some papers; that when her sister called for her to come, she "knew what * * * [she] * * * was going for and took her notary seal * * *"; that upon arrival, she found Mrs. Hoy in her bedroom with Mrs. Weber, Mrs. Pierson, Mrs. Jordan, Pat Jordan, and Mr. and Mrs. Paul Stockdale; that she gave the forms to Mrs. Hoy; that someone helped Mrs. Hoy to sit on the edge of the bed and gave her a magazine to rest the papers on, and

that Mrs. Hoy signed the papers in blank. After signing, Mrs. Hoy gave the papers to Mrs. Jordan who gave them to Mrs. Catalano. Mrs. Catalano, after notarizing the papers took them to her own home and typed in the words "My Brother, Paul R. Stockdale"; that she then took the papers back to the Hoy home and placed them on a desk in the hallway.

Mrs. Stockdale testified that Mrs. Jordan took the papers from the hallway, read them to Fanny and Fanny stated that was the way she wanted them. Her testimony was corroborated by Mrs. Jordan. Paul Stockdale testified that Mrs. Jordan gave the signed papers to him that night, and that he took them back to the insurance agency in Champaign the next morning on February 20, before his sister died at 10:10 a. m. All of the witnesses, except Mr. Hoy, Mr. Arthur Stockdale, and Mrs. Reed were present when Mrs. Hoy was supposed to have signed the papers, and they testified that she knew what she was doing.

Paul Stockdale testified further that during her lifetime his sister had never given him the insurance policy and that he received it from Mr. Hoy after the assured's death when Mr. Hoy was advised of the change of beneficiary. He never paid any of the premiums on the policy. He also stated that his sister, Fanny, and Mr. Hoy seemed to get along well during their married life. This was corroborated by witnesses.

Arthur Stockdale, another brother, testified that he visited his sister on the evening of February 18, and stayed until the early hours of February 19; that her condition was bad, her breathing was abnormal, and that her eyes were glassy. He stated that he had done tax services for his sister on many occasions; that he was familiar with his sister's signature; that the signature to the change of beneficiary form "does not look like hers," and that he "never knew * * * [his] * * * sister to sign her name with the prefix 'Mrs.'" In this last respect his testimony corroborates that of Mr. Hoy, who also testified that he was

informed of the change of beneficiary for the first time after his wife's death, although Paul and he were together later in the evening of February 19.

The first issue presented is whether an oral antenuptial contract obtained between Hoy and his wife by which he acquired an equitable interest in this policy. It is urged by Hoy that the contract did exist and by its terms, both he and his prospective wife promised, one to the other, to convey and hold all their respective property, during their married life, in joint tenancy with rights of survivorship, and to make each other the beneficiary of their respective policies. Claimant, Stockdale, contends that since this was an oral antenuptial agreement in consideration of marriage it is unenforceable as violative of the Statute of Frauds. Ill.Rev.Stat.1957, c. 59, § 1. It is Mr. Hoy's contention that the Statute of Frauds is not applicable inasmuch as there has been full performance of the agreement by him and by his wife during her lifetime, except for the attempted change of beneficiary. He also asserts that the purported change of beneficiary is void for the reasons that the signature thereto is not the genuine signature of his wife, or if the signature is genuine it was procured through the undue influence of Paul Stockdale; that his wife was not competent on the eve of her death to have legally executed the change of beneficiary, and that his wife had no legal right to change the beneficiary in view of his equitable interest in the policy.

Prior to their marriage, Mr. and Mrs. Hoy both resided in Illinois where the conversations creating the alleged prenuptial agreement assertedly took place. The performance contemplated by the alleged terms of the contract was to have taken place in Illinois, and the acts relied upon to show its performance transpired there where the parties resided subsequent to their marriage. It is apparent therefore that the substantive law of Illinois must govern in determining both the validity and the effect of that alleged oral contract. Frankel v. Allied Mills, Inc., 1938, 369 Ill. 578, 17 N.E.2d 570.

In Columbian Circle v. Mudra, 1921, 298 Ill. 599, at page 601, 132 N.E. 213, at page 214, 18 A.L.R. 378, the court said, that "equtable rights may be acquired in a beneficiary certificate of insurance which a court of equity will recognize and enforce." Accordingly, it was there held that where an oral contract existed between the assured and a beneficiary whereby, for a valuable consideration, the assured promised not to substitute another beneficiary, that contract was binding and deprived the assured of the right to change the beneficiary without the promisee's consent. Such contracts are clearly enforceable unless the substituted beneficiary is a bona fide purchaser for value without notice of the claim of the original beneficiary. Supreme Council Royal Arcanum v. Tracy, 1897, 169 Ill. 123, 48 N.E. 401; Order of Columbian Knights v. Matzel, 1913, 184 Ill.App. 15. Since there is no evidence that Paul Stockdale was such a bona fide purchaser for value it is necessary for this court to determine the existence and effectiveness of the alleged oral antenuptial contract.

The evidence fully supports the conclusion and the court finds that a prenuptial agreement did exist between the Hoys, and by its terms all property owned by either of the parties was to be held in joint tenancy, and each was to make the other the beneficiary of his or her respective policies. The testimony of Mr. Hoy to this effect is fully substantiated by all that both he and his wife did subsequent to their marriage with respect to their mutual property. Their acts are not explainable without reference to such a contract. The proof establishes that the deed to the Urbana realty, title to their automobiles, and the bank account were each held by Hoy and his wife as joint tenants. Hoy did make his wife beneficiary of his policies, she remained such during her lifetime, and his wife, shortly after their marriage, also designated him to be the beneficiary of her policy. After their marriage the premi-

ums due on the insurance policies were paid from the joint account. While Mrs. Hoy did not deposit the proceeds of all her government bonds in the joint account, those which she reserved were cashed, whether on the occasion of vacation trips when the proceeds were used for their mutual benefit, or on her death bed, with the approval and consent of her husband, and at his suggestion. Since these bonds were not cashed for the full value it may be concluded that they were not transferable. Code of Federal Regulations, 1949, Title 31, § 315.11. See In re Bartlett, 1947, D.C.N.D.N.Y., 71 F.Supp. 514. These bonds were purchased prior to the marriage in 1950 and although they were registered in her name alone, she did not cash them without the consent of her husband. It may be inferred that the Hoys labored under the impression that the bonds could not be placed in their joint names.

The prenuptial contract is not contradicted by the subsequent attempt to change the beneficiary to Paul Stockdale. It must be observed that this transaction was not initiated by Mrs. Hoy, and that the acts of her friends in attempting to make Stockdale the beneficiary were unsolicited by her at the time, and were performed on the night before Mrs. Hoy died when she was in a weakened condition. Mrs. Weber, Mrs. Jordan, Mrs. Pierson, and Paul Stockdale each testified that Mrs. Hoy had made statements to them after she was aware of her last illness that she wanted to change her beneficiary. However, she repeatedly refrained from doing so, and her explanation on several occasions for her obvious restraint was that her husband disapproved. This reluctance to change the beneficiary without the consent of her husband was not consistent with Mrs. Hoy's earlier practices, because on other occasions she had made changes of beneficiaries without the seal of any notary, and without the consent of the person then designated. Paul Stockdale testified that his sister had not consulted him when on an earlier occasion she transferred the policy from him to her previous husband, Thomas J. Smith. When Mr. Hoy was involved her procedure in regard to changing beneficiaries was conspicuously different. Each of the witnesses testified that the Hoys got along well. Nevertheless, it was noticeable to her friends and it is to the court that Mrs. Hoy was hesitant about making a chang of beneficiary without her husband's consent. This indicates there was an agreement between the Hoys in regard to their life policies. In order to circumvent Hoy's objections, the evidence discloses that he was persuaded to retire to a basement bedroom. After he and Mrs. Reed had departed, Mrs. Weber, acting upon her own initiative, took Paul Stockdale to the insurance agency to secure the proper forms. In the meantime, Mrs. Jordan's daughter, Pat, without any direction from Mrs. Hoy, summoned her sister, Mrs. Catalano, who was a notary public. Armed with the proper documents and with a concerted purpose they confronted Mrs. Hoy with papers which she signed in blank. The papers were completed by Mrs. Catalano. It is questionable whether Mrs. Hoy instructed anyone as to what was to be inserted. The completed document was read to her and these witnesses testified that she approved. Assuming this to be so, this court need not decide what might be implied from this approval, or whether Mrs. Hoy intended the delivery to the insurance agent without the consent of her husband. Nor is it necessary to decide whether, at the time, she was legally competent to execute the change of beneficiary. Her conduct and statements clearly substantiate what is already apparent from the testimony and conduct of her husband, that a prenuptial contract did exist, and that by its terms, each was to be designated the beneficiary of the other's insurance policies. The marital status alone does not offer a complete explanation for the manner in which the Hoys held title to all their property. From all the evidence it must be concluded that the contract did exist

and also that Mr. Hoy completely performed on his part in reliance upon the agreement.

The question next arises as to whether this performance is sufficient to remove the contract from the operation of the Statute of Frauds. Where there has been full performance on one side of an oral contract, the Statute of Frauds will not be invoked to permit its avoidance. Ropacki v. Ropacki, 1933, 354 Ill. 502, 188 N.E. 400. Marriage in itself is not sufficient performance to remove the operation of the Statute of Frauds. Austin v. Kuehn, 1904, 211 Ill. 113, 71 N.E. 841; Richardson v. Richardson, 1893, 148 Ill. 563, 36 N.E. 608, 26 L.R.A. 305; McAnnulty v. McAnnulty, 1887, 120 Ill. 26, 11 N.E. 397; Anglemire v. Policemen's Benevolent Ass'n, 1939, 301 Ill. App. 277, 22 N.E.2d 713. These cases are distinguishable. In each instance, the only consideration in support of the promise sought to be enforced was the sole promise of marriage. In Garlock v. Campbell, 1931, 263 Ill.App. 287, in an alleged contract made prior to the marriage, an intended husband promised his intended wife that if she would marry him he would pay her $20 a week during the time she was on his farm for services she would perform. Though she married and performed the services the court held this was insufficient to overcome the Statute of Frauds, and, by virtue of an Illinois statute (Ill.Rev.Stat.1957, c. 68, § 8) to the effect that neither spouse is entitled to recover compensation for services rendered to the other, disallowed recovery on a quantum meruit basis. The performance, in addition to the marriage, which was relied on by the wife, was not additional consideration for the oral contract because it was obligatory in view of the Illinois Statute.

The Hoys in contemplation of marriage made promises to each other which were performed in full by Mr. Hoy and at least partially by Mrs. Hoy. The promises were in addition to their promises of marriage and as an additional consideration for the contract. Under such facts the Statute of Frauds is not applicable. London v. G. L. Anderson Brass Works, 1916, 197 Ala. 16, 72 So. 359; Larsen v. Johnson, 78 Wis. 300, 47 N.W. 615; Bader v. Hiscox, 1919, 188 Iowa 986, 174 N.W. 565, 10 A.L.R. 316. In McAnnulty v. McAnnulty, supra, 120 Ill. at page 34, 11 N.E. at page 400 the court stated:

"Doubtless a verbal antenuptial agreement might, under special circumstances, be enforced in equity, in order to prevent the party invoking the statute from perpetrating a fraud upon the other party. Thus if, in this case, Mrs. McAnnulty had, by some artifice, trick or device prevented the contract from being reduced to writing, and had received any substantial benefits from it, so that it would have operated as a fraud upon the testator, we have no doubt of the power of a court of equity in such case to afford the proper relief, notwithstanding the statute, on the general principle that the statute is never to be so expounded as to make it a mere instrument in consummating a fraud upon the party against whom it is invoked."

It would be a fraud on Hoy to permit the Statute of Frauds to bar his recovery of the proceeds of the policy since he fully performed his promises. Mrs. Hoy received substantial benefits under the contract which exceeded the single fact of her marriage. While she lived, she enjoyed the expectancies incident to being the designated beneficiary of her husband's policies. The premiums on the life insurance policies were paid from joint funds to which Mr. Hoy contributed. With rights of survivorship in all that she and her husband owned, she enjoyed, during her lifetime, an expectancy in all of his estate which was paramount to the claim of his children by a former marriage. Moreover, by designating her husband the beneficiary of her policy, Mrs. Hoy made it appear that she had so completely performed this part of the agreement as to make a writ-

866

ing unnecessary to assure its performance. If this court were to uphold the attempted death bed revocation, it would lend to her conduct and that of her friends the color of trickery, and would by such confirmation, become itself, the vehicle of a fraud. It is peculiar to say the least, that there was no change of beneficiary attempted until approximately fourteen hours before her death, and it was instigated by her friends. She is supposed to have signed the documents while Mr. Hoy and his friend, Mrs. Reed, were absent and these papers were rushed to the local agent of the insurance company just before her passing. Furthermore, Mr. Hoy, who had lived happily with his wife for almost eight years, was not informed of the change until after Mrs. Hoy's death.

The court is forced to the conclusion that the oral contract between the Hoys existed, is enforceable, and that Mr. Hoy is entitled to the proceeds of the life insurance policy here involved. It is, therefore, unnecessary to determine the validity of the alleged change of beneficiary.

Findings of fact, conclusions of law and final order in accordance with the views herein expressed may be submitted.