# United States Court of Appeals
## For the First Circuit

---

Nos.      00-1453
    00-1741
    00-1742
    00-2107


MANUEL A. BARALT; LIZETTE PENA-AVILES;
CONJUGAL PARTNERSHIP BARALT-PENA; JUAN GONZALEZ-PEREZ;
MONSERRATE CANABAL-DURAN; CONJUGAL PARTNERSHIP GONZALEZ-
CANABEL,

Plaintiffs-Appellees/Cross-Appellants,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY,

Defendant-Appellant/Cross-Appellee,

---

NATIONWIDE INSURANCE COMPANY; NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY; NATIONWIDE LIFE INSURANCE COMPANY; NATIONWIDE GENERAL
INSURANCE COMPANY; NATIONWIDE PROPERTY AND CASUALTY INSURANCE
COMPANY; NATIONWIDE GROUP OF COMPANIES; WILLIAM P. DEMENO,

Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin and Campbell, Senior Circuit Judges.

_____

Sheldon  H.  Nahmon, with  whom  Arturo Diaz-Angueira  and Roberto Feliberti were on brief, for Nationwide.
Ruben T. Nigaglioni, with whom Antonio A. Arias-Larcada was on brief, for appellees/cross-appellants.

_____

May 24, 2001

_____

**COFFIN, Senior Circuit Judge.** A jury found that appellant Nationwide Mutual Insurance Company ("Nationwide") terminated appellees Manual Baralt and Juan Gonzalez-Perez ("Gonzalez") because of their ages, in violation of both the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), and Puerto Rico Law 100, P.R. Laws Ann. tit. 29, §§ 146-51 ("Law 100"). The two men and their wives were awarded a total of more than $6 million in damages and attorney's fees. See Baralt v. Nationwide Mut. Ins. Co., 86 F. Supp. 31, 42 (D.P.R. 2000). On appeal, Nationwide does not challenge the jury's determination that the company acted unjustifiably in terminating appellees, but contends that the evidence failed to support a finding of age discrimination. After a careful review of the record and caselaw, we agree, and therefore reverse.

## I. Factual Background

In the spring of 1993, Nationwide began an investigation into allegations of fraudulent claims practices by one of its adjusters, Quinones, after appellee Baralt, claims manager in the Puerto Rico office ("NPRO"), reported "irregularities" to company headquarters. Nationwide assigned Joanne McGoldrick, an investigator in its corporate security department, to research the allegations.

-3-

During her investigation, which included three visits to Puerto Rico between October 1993 and April 1994,[1] McGoldrick learned of unrelated improper conduct allegedly committed by the vice president of the office, Enrique Lopez. Those improprieties primarily concerned the unauthorized use of company cars, or "pool" cars, and salvage vehicles, including the regular borrowing of pool cars by Lopez's sons and "sales" of salvage vehicles to NPRO employees who had not paid for them. Lopez also was accused of procuring an insurance policy at less than full cost for a Plymouth Sundance used by his son in Ohio by falsely representing that it was being driven by his wife in Puerto Rico.

McGoldrick initially verified the accusations against Lopez by speaking with NPRO's Sales and Marketing Manager, Blanca Robles, and then further investigated the claims during her April visit to Puerto Rico. Nationwide maintains that appellees were terminated in May 1994 because they interfered with the investigation into Lopez's conduct and because of their involvement in certain of the asserted improper practices. The company claims that Gonzalez helped Lopez to obtain the Sundance

---

[1] That probe eventually led Nationwide's auditors to suspect substantial losses, specifically, that Quinones and an accomplice had defrauded the company of $320,000 through payments for nonexistent property damage.

-4-

insurance policy and also was aware of, and facilitated, the use of pool cars by Lopez's sons. Baralt was linked to the alleged improprieties because he was in charge of salvage vehicles for NPRO.

Baralt, NPRO's claims manager, was 49 and had been employed by Nationwide for 25 years; Gonzalez, who was 60, had worked for the company for 28 years and was manager of the personal and commercial lines underwriting department. Baralt and Gonzalez were two of the six high-ranking employees at NPRO known as the "Cabinet." Two others — Lopez and the company's comptroller, Luis Flores Dieppa ("Flores") — also were terminated for improper conduct. The remaining two Cabinet members, one of whom was Robles, left the company about a year after the terminations. The only evidence presented at trial explaining their departures was Robles's testimony that she took advantage of the company's early retirement plan. Five non-Cabinet employees also were terminated.

At trial, in addition to presenting evidence of appellees' involvement in practices the company deemed improper, Nationwide attempted to show that both men interfered in the investigation after being instructed not to do so. McGoldrick accused Gonzalez of intimidating two female employees, whom she had

found crying.[2] She also reported that on multiple occasions she found Gonzalez standing near an office where she was interviewing employees. In a report admitted as a trial exhibit, McGoldrick stated that another employee told her that Baralt had contacted all of the claims division employees who possessed salvage vehicles "and warned them of the scope of our investigation" and advised them not to tell the truth or they would lose their jobs. She further reported that other employees had stated that Baralt had discussed the interview he had with investigators even though he had been told expressly of the requirement of confidentiality.[3]

Appellees sought to rebut Nationwide's evidence of improper conduct in a variety of ways. They presented evidence that there was no company policy against after-hours use of pool cars

_____

[2] The hearsay rule prevented McGoldrick from specifically relating what the two employees said to her, but she testified that, after the first such encounter, she went to Gonzalez's office and said: "Stay out of this investigation. You're intimidating people, they're afraid to talk, they're crying." After the second encounter, she said she asked Gonzalez "to please refrain from contacting our people because it could be subject to disciplinary action up until grounds for termination."

[3] A Nationwide Human Resources officer, James Lucas, testified that both Baralt and Gonzalez admitted during interviews that they had spoken to employees about the investigation, but both denied at trial that they had spoken to coworkers about the inquiry.

by family members,[4] and that, moreover, giving Lopez's sons use of cars in the evening served to protect the vehicles from possible theft from the unsecured company lot, which was in a high-crime area. Although Gonzalez acknowledged arranging the sons' use of the pool cars, he testified that he did so upon instructions from another Cabinet member, Rafael Gonzalez, and further testified that it was Rafael who had responsibility over the pool vehicles. In an effort to negate Nationwide's suggestion that company officials permitted employees to acquire salvage vehicles at no cost, plaintiffs also presented evidence that the company's books showed the debts for the cars. Testimony elicited on behalf of Gonzalez distanced him from the insurance policy obtained by Lopez on the Plymouth Sundance by suggesting that it was not issued under his authority, and there also was evidence indicating that the policy was not improper.[5] As noted, both plaintiffs denied that they had breached the confidentiality of the investigation. Gonzalez defended his frequent appearance near the room where McGoldrick was

---

[4] Robles testified that employees who used pool cars were required to obtain permission and record in a log the reason for the use and the specific period of time the car was needed.

[5] Plaintiffs' counsel elicited evidence indicating that the policy was renewed after the terminations, although Robles also testified that Lopez was required to pay additional premiums for "the discrepancies" in the application.

conducting interviews by explaining that he was using the nearby copy machine, not intimidating employees.

Appellees also emphasized the abruptness and insensitivity exhibited in the circumstances leading up to and accompanying plaintiffs' terminations. After McGoldrick reported on her investigation to Nationwide headquarters, Lucas, the Human Resources officer, was sent to Puerto Rico with final decision-making authority. He had not reviewed plaintiffs' personnel files, claiming that he did not want his decision to be influenced by anything in the files and noting that even a thirty-year record of good employment could be wiped out by one serious improper act. He interviewed each plaintiff for only a brief time, and, at the end of the interviews, pronounced his decision to terminate. Security personnel were standing by to escort each plaintiff with his personal belongings out of the building.

The sum total of evidence relating to age is the following:

— Baralt, 49, was replaced by Morales, 47. Although Baralt at first testified that Morales was replaced by "a much younger man," he later admitted that he had no idea why Morales left the company or whether his replacement was younger or much younger.

— Gonzalez, 60, was replaced by Guzman, 43.

— Lopez, the NPRO vice president, 54, was temporarily replaced by Robles, also 54, indeed three weeks older than Lopez.  His permanent replacement was Jack Wood, whose age was not made of record.

— Flores, NPRO's comptroller, was 44 when he was terminated. There is no evidence of his replacement's age.

— The two Cabinet members who were not fired were Robles, 54, and Rafael Gonzalez, 57.

— In addition to the above four Cabinet members, there were five subordinate employees discharged for misappropriation of vehicles.  Nothing appears in the record concerning their ages or those of any replacements.

When Gonzalez was asked directly what support he had for his age discrimination claim, he replied:

> Well, based on the performance that I was realizing or that I was doing, my devotion to the company, the success that the agency was having every year, over 18 long years and always willing to make a maximum effort to the company's benefit, to the benefit of our customers.  I was in a good state of health, there was no reason.

The jury nonetheless found that age played a motivating role in the terminations of Gonzalez and Baralt in violation of both the ADEA and Law 100, which prohibits employment discrimination

based on a variety of factors, including age.[6]  The jury also returned a verdict for plaintiffs on a third count for unjust dismissal under Puerto Rico's "Law 80," P.R. Laws Ann. tit. 29, §§ 185a-185m, which prohibits discharges "made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment."  Id. at § 185b.  The jury awarded Baralt $1 million in non-economic damages and Gonzalez $1.5 million, plus $500,000 to each of their wives. The district court modified these amounts by reducing the wives' damages to $100,000 each and by doubling the compensatory awards, as prescribed by Law 100, to $2 million (for Baralt) and $3 million (for Gonzalez).  The jury also awarded back pay in the amount of $500,000 to Baralt and $400,000 to Gonzalez. Plaintiffs also were awarded more than $140,000 in attorney's fees, for a total of approximately $6.24 million.

The court, which had taken under advisement Nationwide's motion for judgment as a matter of law, ruled first that the jury was entitled to find that the company's reasons for the terminations were pretexts.  Baralt, 86 F. Supp. at 37.  It then cited, as the evidentiary support for the jury finding of age

_____

[6] Law 100 also bars employment discrimination because of race, color, gender, social or national origin, social position, political affiliation, political or religious ideology, and marital status.  P.R. Laws Ann. tit. 29, § 146.

discrimination, testimony by Robles that Nationwide had a company-wide retirement plan of which she had taken advantage.[7] Id.

On appeal, Nationwide challenges the district court's denial of its motion for judgment as a matter of law on the federal and Commonwealth age discrimination claims and further contends that, if it is unsuccessful in overturning the liability finding, the damage awards must be reduced because they are unsupported and excessive. Plaintiffs filed cross-appeals, claiming that they are entitled to a higher amount of both damages and attorney's fees. Our disposition in favor of Nationwide on the merits makes it unnecessary to address plaintiffs' assertions or Nationwide's challenge to the amount of damages.

## II. Discussion

The primary issue we face is whether the evidence was sufficient to support the jury's finding of age discrimination.

---

[7] As we have elsewhere observed, an offer of early retirement is not, on its own, evidence of discriminatory animus. See Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993). A fortiori, an early retirement plan embracing all of a company's many branches throughout the nation is even more distanced from proof of animus. Were this not so, a host of progressive companies with such policies would be surprised to find themselves vulnerable to age discrimination suits.

The parties agree that, if we were to conclude that plaintiffs are not entitled to recover under Law 100, they also would have failed to prove age discrimination under the ADEA because Law 100 offers a "significantly more favorable" standard to plaintiffs than does the ADEA. Cardona Jimenez v. Bancomercio de Puerto Rico, 174 F.3d 36, 42 (1st Cir. 1999). Our analysis therefore begins with Law 100, and, because we conclude that plaintiffs have not shown a violation of that statute, it also ends there.

Under Law 100, a plaintiff establishes a prima facie case of age discrimination by (1) demonstrating that he was actually or constructively discharged, and (2) alleging that the decision was discriminatory. Id. If this minimal showing is made, the burden shifts to the employer to prove by a preponderance of the evidence that it had "just cause" for its actions. Id. at 42-43; Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998). If the employer establishes just cause, the burden of proof returns to the plaintiff. Bancomercio, 174 F.3d at 43. If the employer fails to prove just cause, however, it bears the burden of proving by a

preponderance of the evidence that the decision was not motivated by age discrimination. Id.[8]

Nationwide acknowledges that the record permitted the jury to find that Baralt and Gonzalez were terminated without just cause,[9] requiring the company to prove that the dismissals were not motivated by age-based animus. The company asserts that the total lack of evidence suggestive of age bias, together with Nationwide's substantial evidence of a non-pretextual inquiry into improper activities at the Puerto Rico office, required the

---

[8] The burden-shifting framework under the ADEA requires more of a showing by the plaintiff, beginning with the prima facie case. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). To establish a prima facie case, the plaintiff must show that: (1) he was at least 40 years old; (2) his job performance was meeting the employer's legitimate job expectations; (3) he was fired or suffered other adverse employment action attributable to the employer; and (4) the employer had a continuing need for the same services he had been performing. Suarez, 229 F.3d at 53. If this showing is made, a presumption of discrimination attaches. Bancomercio, 174 F.3d at 41. The employer at that point need only articulate a legitimate, non-discriminatory reason for the termination to shift the burden back to the plaintiff to prove by a preponderance of the evidence that the employer's reason was a pretext and that the real reason was age-based animus. Id. Although the employer in this framework briefly has the burden of producing a legitimate reason for the discharge, the burden of persuasion always remains on the employee. Id.

[9] Although the company states that it assumes only arguendo, for purposes of the appeals, that the record supports such a finding, the jury made the specific determination that the company had violated Law 80 by discharging each plaintiff without just cause. The company did not appeal the Law 80 verdicts.

-13-

jury to reject plaintiffs' Law 100 claims.  We review de novo the district court's contrary judgment, taking the facts in the light most favorable to plaintiffs.  Id. at 41.  For Nationwide to prevail, we must conclude that "there is no legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff[s]."  Id. at 40.

It is undisputed that the record contains no direct evidence of age discrimination, not even the sorts of stray remarks that are suggestive but often found insufficient to prove discrimination in the absence of more meaningful evidence.  See, e.g., Williams v. Raytheon Co., 220 F.3d 16, 18 (1st Cir. 2000) (rejecting age and gender claims where supervisor told colleagues that the company was run by "old, white men," that she intended to change the corporate culture, and would favor the hiring of women and younger people);  Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998) (rejecting age discrimination claim where district manager had asked plaintiff "how old he was and when he planned to retire").

Although Gonzalez, who was 60, was replaced by someone significantly younger – a 43-year-old – that successor also was within the protected age group, diminishing the force of the age difference as an indicator of bias.  This solitary fact gains no strength from the evidence that Baralt's replacement was only

two years his junior, a difference that is insufficient to support even a prima facie case of age discrimination. See Raytheon, 220 F.3d at 20. Moreover, the two Cabinet members who were not discharged also were over 40; Rafael Gonzalez was 57 and Robles was 54. Lopez, the office vice president, was immediately succeeded by Robles, who was slightly older than he. The parties have not identified the ages of Lopez's ultimate replacement or the replacement for Flores, the fourth Cabinet member who was terminated. In addition, as noted earlier, there was no evidence of the ages of the five lower-level employees who were terminated. Thus, plaintiffs' affirmative showing of age discrimination consisted entirely of three facts: they were within the protected class, they were fired, and one of them was replaced by someone significantly younger — though that individual was still within the protected age group.

Nationwide's rationale for the firings, on the other hand, was far from compelling. Taken in the light most favorable to plaintiffs, the company's position was that the two men – each with more than two decades of apparently high quality service to the company – were terminated summarily for (1) their peripheral involvement in a series of improper but relatively minor acts in which their boss and other employees had taken advantage of the

company, and (2) their discussions with co-workers, in violation of instructions, about the investigation into those improper acts. Moreover, as we have noted earlier, the circumstances surrounding the terminations executed by Lucas gave every appearance of an insensitive overreaction to a series of minor transgressions.

We have no problem accepting that a jury reasonably could conclude that a large, reputable company would not act as precipitously as Nationwide could be found to have acted if its actual concern were the minor transgressions that it claimed underlay the terminations. In other words, we think the jury was entitled to disbelieve Nationwide's stated reasons for the firings. Our problem, rather, arises from the absence of evidence that would permit a conclusion that the actual reason for the firings was plaintiffs' ages. For, even in the face of Law 100's presumption, we conclude that the evidence presented by Nationwide, in the context of the evidence presented by plaintiffs, was sufficient to meet its burden under Law 100 to demonstrate that "the existence of discrimination was less probable than its nonexistence," Belk Arce v. Martinez, 98 J.T.S. 92 (P.R. 1998), Official Translation at 16.

The evidence was undisputed that Nationwide began investigating the Puerto Rico office as a result of Baralt's

-16-

report concerning Quinones's allegedly fraudulent conduct, and that the specific probe leading to plaintiffs' dismissals was triggered by a tip from someone in the office about Lopez's personal use of a salvage vehicle. Robles corroborated the tip for McGoldrick before the investigator traveled to Puerto Rico in April 1994. The inquiry into Lopez's actions led to Gonzalez and Baralt – the former because of his involvement with the fraudulent automobile policy and the pool cars, and the latter because he was responsible for salvage vehicles.

That the investigation unquestionably was triggered by employees in the Puerto Rico office, rather than by the home office executives who carried out the terminations, makes it unlikely that the inquiry was fabricated as a ruse to accomplish age-based terminations. Moreover, the fact that the investigation was launched in 1993 rules out any rational theory that it was conceived as a device to target plaintiffs, each of whom had received letters of commendation in early 1994.[10] A company seeking pretextual reasons to discharge employees on the basis of their advancing ages would be unlikely to offer thanks

---

[10] Both received letters dated March 4, 1994, from the senior vice president for business operations, William P. DeMeno, with information about their payments under the 1993 Management Incentive Plan.

for those employees' "efforts and contributions to the successes of this past year."

Plaintiffs presented no evidence to discredit the authenticity of the investigation.  While, as we have noted, the callous severity of the punishment in all likelihood moved jurors to doubt that the discharges occurred for the stated reasons, the evidence was substantial that the firings were in some way a byproduct of the home office probe into the Puerto Rico operations.  On this record, various investigation-related explanations for terminating plaintiffs were much more likely than the completely unsubstantiated age bias asserted by plaintiffs: Nationwide may have sought to clean house at the highest levels of NPRO's management after concluding that "business as usual" there did not satisfy the company's standards; it may have interpreted reports from McGoldrick as well as the auditors as indicating a widespread laxness and invitation to corruption that had to be wiped out; the company may have decided to terminate any manager who failed to comply fully with the investigation as a show of authority to assure fidelity on the part of branch supervisors; the Human Resources officer, Lucas, may have felt the need to justify the time and expense of the investigation by terminating a sufficiently large number of employees, whether or not they in fact committed

wrongdoing, or he may simply have lost perspective and acted rashly. None of these reasons would support liability under Law 100.

In sum, with virtually no evidence besides the discharges themselves pointing to age as a factor and none indicating that the investigation was fabricated by company officials to conceal other motives, a reasonable jury could not entirely reject the company's abundant evidence that the terminations stemmed, however unwisely, from the investigation. Even under Law 100's pro-plaintiff system of shifting burdens, Baralt and Gonzalez could not prevail with the mere allegation of age bias that established their prima facie case once Nationwide presented uncontroverted evidence of a real, if overly aggressive, inquiry into office protocols. Cf. Bancomercio, 174 F.3d at 42-43 (reversing jury verdict for plaintiff under Law 100 where "the closest approximation to evidence of age discrimination was the basic fact that [plaintiff] was over 40 when fired and was replaced by someone slightly under 40").

Nationwide's burden to defeat the presumption was to "present evidence of sufficient quality to convince the judge that the existence of discrimination was less probable than its nonexistence," Belk Arce, Official Translation at 16; Ibanez v. Molinos de Puerto Rico, 114 D.P.R. 42 (1983), Official

Translation at 75-76. Circumstantial evidence is sufficient to meet the defendant's burden. <u>Ibanez</u>, Official Translation at 72 ("For the presumption to be rebutted it suffices that [the employer] proves, even through circumstantial evidence, that the motive for the discharge was <u>not</u> discriminatory.") (emphasis in original). Plaintiffs' efforts to counter Nationwide's substantial evidence of a genuine investigation with proof that they did little or nothing wrong shores up their claim for unjust dismissal, but such evidence is not on its own probative of age discrimination. <u>Cf.</u> <u>Feliciano de la Cruz</u> v. <u>El Conquistador Resort and Country Club</u>, 218 F.3d 1, 9 (1st Cir. 2000) (affirming summary judgment against plaintiff on claim of national origin discrimination because "if we remanded for trial, the jury 'would be left to guess at the reasons behind the pretext'" (citation omitted)); <u>Ibanez</u>, Official Translation at 77 (reversing trial judge's finding of discrimination under Law 100 where plaintiff offered only "speculative" argument that she was discharged based on age rather than because of confidentiality breach).[11]

---

[11]The strength of Nationwide's evidence of a legitimate investigation distinguishes this case from <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097, 2104 (2000), in which the Supreme Court upheld a jury's finding of an ADEA violation based on plaintiff's prima facie case and "sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision." Although Law

-20-

We have intently scrutinized the Puerto Rico cases cited to us to see what light they shed on a record as bereft of indicia of discriminatory intent as this. In every case we have examined, there was some evidence of discriminatory intent beyond the allegations necessary to make a prima facie case of discrimination. In Casto Soto v. Caribe Hilton Hotel, 137 D.P.R. 294 (1994), Official Translation at 12-13, the court noted that plaintiff not only had rebutted the employer's proffered reason for termination, but also had submitted evidence of the dominating presence of under-40 personnel and the company's efforts to create unfavorable disciplinary records for its older employees. In Belk Arce, Official Translation at 10-11, there was a consultant's report indicating anti-marriage animus within the defendant law firm, as well as a partner's

_____

100 differs from the ADEA in that the defendant bears the burden of disproving discrimination, the factors we consider in assessing the evidence are the same:

> the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Id. at 2109. Here, as we have explained, consideration of these factors, including the failure of plaintiffs' evidence to "shed any light on . . . [the employer's] true reason for firing" them, Feliciano de la Cruz, 218 F.3d at 8, reveals "the particular weakness" of plaintiffs' case, id. at 10.

-21-

specific anti-marriage statement referring to plaintiffs.  In Sandoval v. Caribe Hilton Int'l, 99 J.T.S. 166 (P.R. 1999), Official Translation at 4, 6, the plaintiff introduced evidence that new management had instructed supervisors to exert pressure on older workers to retire.[12]

In a leading case in which the court reversed a judgment for plaintiff, Ibanez, Official Translation at 76-77, we find a concatenation of circumstances similar to those present here: a qualified 63-year-old plaintiff, replaced by a 20-year-old, then a 28-year-old, and finally a 57-year-old individual; and a five-week delay between the occasion relied on as the cause of discharge (impermissibly viewing confidential records) and the actual termination.  In other words, a prima facie case had been made and there was a basis for rejecting the employer's explanation.  But there was no evidence of animus.  Five of twelve executive secretaries in plaintiff's class were over 40, plaintiff herself had been 60 when hired, and, like plaintiffs

---

[12] We note that Sandoval constitutes a "judgment," rather than an opinion of the Puerto Rico Supreme Court, and therefore carries no precedential value beyond the "'intrinsic persuasive value of its rationale.'" Clemente v. Carnicon-Puerto Rico Mgmt. Assocs., 52 F.3d 383, 389 n.6 (1st Cir. 1995) (quoting Rivera Maldonado v. Commonwealth of Puerto Rico, 119 D.P.R. 74 (1987) (Official English Translation, No. R-85-117, slip op. at 4-5)),*abrogated on other grounds by* United States v. Gray, 199 F.3d 547 (1st Cir. 1999).

in the case at bar, she had been looked on favorably up until the incident in question.

Having canvassed both the record and caselaw, we conclude that a decision holding that the requirements of Law 100 were met by the facts of this case would extend the statute far beyond its intended reach. If this record were enough, the result would be a virtual merging of Law 80, which bars unjust dismissals, with Law 100. Notwithstanding Law 100's presumption, proof of unjust cause cannot suffice to establish liability where there is considerable evidence of a non-discriminatory reason for the discharge and no evidence of age bias other than the employee's age. That this must be so is evident when one considers the hypothetical claim allowable under Law 100 of a minority woman over the age of 40 who alleges race, gender, and age discrimination in a termination arising from similar circumstances. Without the need for some evidence linked to the particular animus, she could recover on any, or all, of her theories by virtue of her protected status. The jury's verdict would be both speculative and unsupported with respect to each claim.

Plaintiffs may well have been terminated too precipitously, but we conclude that Nationwide met its burden to demonstrate,

by a preponderance of the evidence, that Baralt and Gonzalez were not fired on account of age.

The judgments for plaintiffs on the age discrimination counts are therefore reversed, the award of attorney's fees is vacated, and the case is remanded for further proceedings as necessary to enter judgment in connection with the claim for unjust dismissal under Law 80.